# Exhibit "A"

89

```
 1      A.     She placed it with the base of the
 2  club bag on the floor and she leaned it up
 3  against so that it was leaning up against the
 4  seat and the back of the cart.
 5      Q.     Okay.  Then she proceeds into the
 6  clubhouse with you?
 7      A.     Correct.
 8      Q.     And Cindy and Elaine were where at
 9  this point?
10      A.     In our general vicinity but I can't
11  say exactly where.
12      Q.     Do you know if they were engaged in
13  this conversation or could hear this
14  conversation?
15      A.     I don't know.
16      Q.     All right.  Do you remember talking to
17  either Cindy or Elaine as you got out of your
18  cart?
19      A.     No.
20      Q.     What happens next?
21      A.     We went to the clubhouse and we sat
22  and waited.
23      Q.     But your memory is that Cindy and
24  Elaine both left their clubs outside?
```

90

1     A.     Under the covering near mine, yes.

2     Q.     Why did you leave your clubs outside?

3     A.     Because we were still planning to

4   continue to play.

5     Q.     So now you go in the clubhouse.  Do

6   you know what time it is?

7     A.     I'm guessing, it was approximately

8   10:15.

9     Q.     Okay.  What happens next?

10     A.     We had some more pastry because we

11   were told this was a passing storm and we would

12   probably continue to play, and so we were

13   waiting.

14     Q.     And who were you waiting with?

15     A.     With our group, Cindy, Elaine and

16   Beverly.

17     Q.     And how long did you wait?

18     A.     Several minutes had passed, we had a

19   little bit of pastry and then the weather

20   started to get very bad outside.

21     Q.     Then what happened?

22     A.     The rain was coming down, torrential

23   rain, and I remembered Beverly's clubs were in

24   the cart.

GOUDREAU & GROSSI COURT REPORTING (508) 823-4659

1     Q.    Okay.  What happened next?

2     A.    I got up and I told Beverly I'm going

3     to go for your clubs because I was afraid they

4     would be ruined.  I said stay there, I'm going

5     to go for them.

6     Q.    Now your testimony is that the clubs

7     were standing up on the passenger side of the

8     cart; correct?

9     A.    Leaning.  They weren't standing up

10    straight, they were leaning, standing from the

11    floor down to the back of the seat.

12    Q.    Okay.  And they were underneath the

13    roof of the cart; correct?

14    A.    Yes.

15    Q.    So you went outside?

16    A.    Yes.

17    Q.    And you walked over to the cart?

18    A.    I ran over to the cart.

19    Q.    Why did you run?

20    A.    The rain was torrential.

21    Q.    Did you have anything to protect

22    yourself from the rain?

23    A.    No.

24    Q.    You didn't have a poncho?

GOUDREAU & GROSSI COURT REPORTING (508) 823-4659

92

```
1       A.    No.

2       Q.    How about an umbrella?

3       A.    No.

4       Q.    Could you go from the clubhouse to

5   your cart by walking under any sort of a cover

6   or a roof?

7       A.    No.

8       Q.    All right.  So when you exited the

9   clubhouse door to when you got to the cart, did

10  you get wet?

11      A.    Yes.

12      Q.    How wet?

13      A.    I was very wet.

14      Q.    Was anyone with you?

15      A.    No.

16      Q.    Was anyone else outside when you went

17  back to your cart?

18      A.    Yes.

19      Q.    Who else was outside?

20      A.    Beverly came outside.

21      Q.    All right.  When did she come outside?

22      A.    I don't know.

23      Q.    Okay.  So you get to the cart and what

24  happens?
```

1        A.     When I left the clubhouse, I looked

2    and I saw that there was part of the awning

3    still available.  Space was available under the

4    awning, so rather than walk the clubs back or

5    run with them back, I figured I would drive them

6    up under the covering, and that's what I did.  I

7    proposed to bring the cart up to be covered.

8        Q.     So from where you had parked the cart

9    to where you were going to put it under the

10   awning, how far was that?

11       A.     I don't recall.  I can't calculate

12   that for you.

13       Q.     Was it the width of a green?

14       A.     Every green is different in size.

15       Q.     All right.  Well, how long did it take

16   you to go from where you were parked to --

17       A.     I don't know.

18       Q.     At all?

19       A.     At all.

20       Q.     When you got in your cart, what did

21   you have to do to get it to move?

22       A.     Press the accelerator.

23       Q.     All right.  And how was the cart

24   positioned when you got into it before it moved?

94

1    Which direction was it facing?

2        A.    It was facing towards the clubhouse.

3        Q.    And how about the awning or the canopy

4    that the carts were parked under, how was it

5    facing relative to the canopy?

6        A.    It was facing towards the canopy.

7        Q.    All right.  So from where you had

8    parked your cart in the parking lot and the

9    clubhouse door, in a straight line was the area

10   you were going to park?

11       A.    Not exactly straight but yes, in a

12   straight forward motion I would say.

13       Q.    Okay.  And what was the ground made of

14   between where you were parked initially and the

15   covered area, the canopied area?

16       A.    It was pavement.

17       Q.    It was pavement.  And what about any

18   incline?

19       A.    No.

20       Q.    It was flat?

21       A.    Yes.

22       Q.    Okay.  So when you got into the cart,

23   you step on the gas and you drive towards the

24   canopy?

1      A.    Yes.

2      Q.    What happens next?

3      A.    I stopped the cart, press the brake

4   and get out of the cart.

5      Q.    Okay.  You were able to park just by

6   pulling in?

7      A.    Yes.

8      Q.    You didn't have to maneuver the cart

9   at all?

10     A.    No.

11     Q.    And were you able to get the cart

12  fully under the canopy?

13     A.    I believe it was.  The passenger side

14  was right at the edge of the canopy so there was

15  still some rain coming down or coming from the

16  roof but it was basically under the canopy.

17     Q.    So what happened next?

18     A.    Beverly asked me if I thought the

19  clubs would be okay or are they still getting

20  wet.

21     Q.    All right.  And where is Beverly?

22     A.    She's standing in front of the cart.

23     Q.    Okay.  Is she under the cover?

24     A.    Yes.

96

1      Q.     She's under the canopy roof?

2      A.     Yes.

3      Q.     Now, how far is this canopy from the

4    clubhouse door?

5      A.     She's standing almost directly to the

6    side of the door.

7      Q.     All right.  Using this room as your

8    guide, is the front door, I mean is the

9    clubhouse door and the place of parking that

10   you're parked as wide as this room?

11               MR. REILLY:  I object to the

12   form because the record will never demonstrate

13   the width of the room.  It's an improper

14   question.

15               THE WITNESS:  Yeah, I don't

16   know.

17     Q.     BY MS. BENSON:  How about this, from

18   the clubhouse door to where you were parked, can

19   you tell me in cart lengths?  All right.  The

20   size of the cart, from the nose to the rear, how

21   far you were?

22               MR. REILLY:  Are we at the final

23   place?  There were two places of being parked.

24               MS. BENSON:  The second place is

GOUDREAU & GROSSI COURT REPORTING (508) 823-4659

1     what I am focusing on.

2                    MR. REILLY:  Just so we're

3     clear.

4                    MS. BENSON:  Thank you.

5                    THE WITNESS:  Maybe from the

6     door to what part of the cart?

7        Q.    BY MS. BENSON:  The nose of the cart,

8     the front of the cart.

9        A.    Right in the center because they're

10    parallel to each other.

11       Q.    I'm sorry?

12       A.    If the door is here, my cart is this

13    way, so do you want it to the middle of the

14    cart?  From the door to the cart?

15       Q.    Let me see if I can help you with

16    this.  Your cart is parked with its driver's

17    side to the clubhouse?

18       A.    Yes.

19       Q.    Okay.  And when we say with your

20    driver's side to the clubhouse, do you also mean

21    the clubhouse door?

22       A.    Yes.

23       Q.    So where is Mrs. Pine standing?

24       A.    Directly in front of the golf cart.

98

```
 1        Q.    And the cart is backed up underneath

 2   the canopy?

 3                   MR. REILLY:  I object to the

 4   form.

 5                   THE WITNESS:  No.

 6        Q.    BY MS. BENSON:  I'm not trying to

 7   confuse you, I'm just trying to get a picture of

 8   it.  So your testimony is that you drove right

 9   up underneath the canopy?

10        A.    Yes.

11        Q.    You stop the cart?

12        A.    Yes.

13        Q.    Then what happened?

14        A.    I got out of the cart.

15        Q.    Okay.  Then what happened next?

16        A.    And Beverly said, do you think the

17   clubs will be okay or are they still going to

18   get wet.

19        Q.    And how far away from you was

20   Mrs. Pine?

21        A.    A few feet.

22        Q.    A few feet.  How far was she from the

23   clubhouse door?

24        A.    I don't know, maybe ten feet.
```

99

1      Q.    And what happened next?

2      A.    I proceed to go around the back of the

3   cart to come up the passenger side of the cart

4   and before I knew what was happening, the cart

5   was jumping forward.

6      Q.    You went around the rear of the cart?

7      A.    Yes.

8      Q.    Why not come around the front of the

9   cart?

10              MR. REILLY:  I object to the

11   form.  You can answer.

12      Q.    BY MS. BENSON:  Your testimony was

13   that Mrs. Pine was in front of the cart?

14      A.    Yes.

15      Q.    And that the door to the clubhouse was

16   in the front of the cart?

17              MR. REILLY:  I object to the

18   form.

19              THE WITNESS:  Right.

20      Q.    BY MS. BENSON:  But that was your

21   testimony?

22      A.    Yes.

23              MR. REILLY:  Well, I object to

24   the form.

100

1        Q.    BY MS. BENSON:  So you went around the

2    back of the cart and what happened next?

3        A.    When I got to the passenger side, the

4    cart moved forward, jumped forward.

5        Q.    And you got out of the cart.  Did you

6    leave the key on?

7        A.    Yes.

8        Q.    When you got out of the cart, did you

9    do anything to that lever?

10       A.    No.

11       Q.    All right.  Did you do anything else

12   when you got out of the cart?

13       A.    Just to press the brake.

14       Q.    And then you walked around the back,

15   and were you talking to Mrs. Pine?

16       A.    No.

17       Q.    Was she speaking to you?

18       A.    No.

19       Q.    Was it still raining?

20       A.    Yes.

21       Q.    So why were you going around to the

22   passenger side of the cart?

23       A.    I went to go move the clubs.

24       Q.    Okay.  Did you move the clubs?

101

1    A.    No.

2    Q.    What happened?

3    A.    The cart moved forward.

4    Q.    And what did you do?

5    A.    I looked at what was happening and

6    proceeded to follow the cart.  It was moving

7    forward.

8    Q.    And what did Mrs. Pine do?

9    A.    She was backing up, backing straight

10   back.

11   Q.    All right.  What was she standing on?

12   A.    She was on cement at that time.

13   Q.    Did she have anything in her hands?

14   A.    Not that I recall.

15   Q.    So you proceed along with the cart.

16   Were you walking?

17   A.    I had to be walking.  I was walking.

18   Q.    Were you running?

19   A.    No, I was following the cart.  At that

20   point it wasn't -- it was just jerking forward.

21   Q.    Did you try to stop it with your

22   hands?

23   A.    It took off.  You couldn't stop it

24   at that point.

102

1    Q.    Did you ever get back in the cart?

2    A.    Never.

3    Q.    Did you see where the clubs were?

4    A.    No, they were in the front seat still.

5    I didn't see exactly where they were.

6    Q.    What happened next?

7    A.    Beverly fell backward onto the grass

8    and the cart proceeds to go forward over her and

9    it stopped and I lifted the golf cart up and

10    over Beverly to relieve her from the golf cart.

11    Q.    How much do you weigh?

12    A.    Right now, 135.

13    Q.    And how tall are you?

14    A.    5'3.

15    Q.    And you lifted the golf cart up?

16    A.    Yes, I did.

17    Q.    Was it still running?

18    A.    Yes, it was.

19    Q.    And then what happened?

20    A.    And then that threw me forward and I

21    was on the ground, and we both were waiting for

22    ambulances to come.

23    Q.    Were you injured?

24    A.    Yes.

103

```
 1        Q.    How were you injured?

 2        A.    I hurt my right hip and right leg, my

 3   knee.

 4        Q.    How did your knee get injured?

 5        A.    From the fall I would assume.

 6        Q.    And your hip?

 7        A.    Same, from the fall.

 8        Q.    Could you see your injury?

 9        A.    No.

10        Q.    So you didn't require stitches or

11   anything like that?

12        A.    No.

13        Q.    You said you were both on the ground;

14   is that right?

15        A.    Yes.

16        Q.    And what was Beverly doing?

17        A.    I don't know.

18        Q.    Was she speaking?

19        A.    I don't know.

20        Q.    What were you doing?

21        A.    I was just lying.  I was face down and

22   they told me to stay in the same position until

23   the ambulance arrived.

24        Q.    Who told you that?
```

104

1      A.     The members of the golf course, member

2   guests, friends that were around us at that

3   point.

4      Q.     How long did it take for you to get

5   the cart off Beverly and for people to come?

6      A.     I don't know.

7      Q.     Do you have any idea if it was a

8   minute or seconds?

9      A.     No, not at all.

10      Q.     Were you conscious the whole time?

11      A.     I remember throwing the cart off of

12   her and being on the ground and somebody saying

13   stay where you are, we called 911.  I don't know

14   in that period of time how long or if -- I just

15   don't know.

16      Q.     Is it still raining?

17      A.     It's torrential rain.

18             MS. BENSON:  All right.  I'd

19   like to take a break.

20             (Break taken.)

21             (Exhibit 2 was marked for

22   identification.)

23      Q.     BY MS. BENSON:  After she exited the

24   cart to go to the clubhouse, did Mrs. Pine ever

GOUDREAU & GROSSI COURT REPORTING (508) 823-4659

105

1    touch her golf bag again?

2        A.    After she exits her cart?

3        Q.    Your carts are together to go into the

4    clubhouse?

5        A.    She went and removed her bag from the

6    back of the golf cart.

7        Q.    But after that, did she ever touch the

8    golf clubs again?

9        A.    No.

10        Q.    Okay.  And when you drove the cart

11    from the parking lot area to the canopy area,

12    did you sit or stand?

13        A.    Sit.

14        Q.    Okay.  Was the seat wet?

15        A.    Yes.

16        Q.    Were the clubs wet?

17        A.    Yes, everything was wet.

18        Q.    Did you look at the clubs?

19        A.    No.

20        Q.    While you were driving the cart, where

21    were the clubs, this is between the parking area

22    and the canopy area?

23        A.    They were where she left them in the

24    cart.

106

1    Q.    They didn't move at all when you

2    started up the cart?

3    A.    I don't recall.

4    Q.    And how about after you walked around

5    the back and now you're standing on the

6    passenger side and you said the cart starts.

7    Could you tell me that again?

8    A.    It just began to move in a forward

9    motion.

10    Q.    Smoothly?

11    A.    No, it was a little bit of a jerk

12    motion that I recall.

13    Q.    And what did you do when it started

14    moving?

15    A.    I just followed it.  It was moving

16    forward, I followed it.

17    Q.    And did you try to grab at the cart?

18    A.    At that point, no.

19    Q.    Did you see the clubs while you were

20    following it?

21    A.    I didn't look at the clubs as I was

22    following it.

23    Q.    Did you say anything?

24    A.    I don't recall saying anything.

107

1    Q.    Did Mrs. Pine say anything?

2    A.    I heard her call my name out when this

3  first started.  That's what I remember hearing.

4    Q.    Now as you're following the cart,

5  which way are you facing?

6    A.    I'm facing Beverly.  I'm in the back

7  facing the back of the cart.

8    Q.    So when you say you're following the

9  cart, you weren't alongside of it?

10    A.    It moved forward enough that I was now

11  behind it.

12    Q.    Okay.  Can you see over the top of the

13  cart?

14    A.    I don't recall at that moment.

15    Q.    Well, relative to your position behind

16  the cart, where is Mrs. Pine?

17    A.    In front of the cart.

18    Q.    Directly in front of the cart?

19    A.    I believe so.

20    Q.    Okay.  And is the cart following a

21  straight path?

22    A.    It started straight and then it moved

23  going towards the right.

24    Q.    Okay.  When you got out of the cart,

GOUDREAU & GROSSI COURT REPORTING (508) 823-4659

108

1    do you know what position the wheels were in?

2        A.    No, I do not.

3        Q.    Okay.  And as the cart moved forward,

4    did it travel over anything other than the

5    concrete?

6        A.    At what period in time?

7        Q.    After you were behind it.  Let me ask

8    you this.  When you were behind the cart and it

9    was in front of you, what was the cart traveling

10   over?

11       A.    Pavement.

12       Q.    And what was Mrs. Pine standing on?

13   I'm sorry, I may have asked you this.

14       A.    Pavement.

15       Q.    Okay.  And when the cart started

16   veering, was it still on pavement?

17       A.    It was as it started veering.

18       Q.    And when the cart hit Mrs. Pine, what

19   was it traveling on?

20       A.    Grass.

21       Q.    Okay.  And did you see the direction

22   that the wheels were in when it hit Mrs. Pine?

23       A.    No.

24       Q.    I'm sorry to have to ask you this but

109

1    how did it hit Mrs. Pine?

2        A.    I don't know how it hit her.  She fell

3    backward and it continued to go forward over

4    her.  I'm not sure how, if it hit her and she

5    fell and then it hit her.  I don't know how it

6    hit her.

7        Q.    You didn't actually see the impact

8    then?

9        A.    No.

10       Q.    And when the cart and Mrs. Pine, when

11   the cart ran over Mrs. Pine, how far away were

12   you?

13       A.    I was behind the cart, maybe just a

14   foot or so because it was traveling.

15       Q.    If you reached out, could you have

16   grabbed the cart?  Was it that close?

17       A.    I don't think at that point it was

18   when it came to impact.

19       Q.    And what are you on now?  Are you

20   still on concrete?

21       A.    I am on grass when I get to the cart.

22       Q.    And what are you wearing for shoes?

23       A.    Golf shoes.

24       Q.    And those are the shoes with the

GOUDREAU & GROSSI COURT REPORTING (508) 823-4659

110

1    cleats at the bottom?

2        A.    Rubber cleats.

3        Q.    Rubber cleats?

4        A.    Yes.

5        Q.    And do you know what Mrs. Pine is

6    wearing?

7        A.    She had her golf shoes on, I believe.

8        Q.    Okay.  You testified that you, the

9    feeling was that play would resume.  You

10   intended to resume?

11       A.    Yes.

12       Q.    So you knew you had your golf shoes

13   on?

14       A.    Yes.

15       Q.    And you believe Mrs. Pine had her golf

16   shoes on?

17       A.    I believe so.

18       Q.    From when you had gone in because of

19   the rain, had you gone into the locker room at

20   all?

21       A.    I don't remember.

22       Q.    Do you know if Mrs. Pine went into the

23   locker room?

24       A.    I don't know.


GOUDREAU & GROSSI COURT REPORTING (508) 823-4659

111

```
 1        Q.    Did you change out of your golf

 2   clothes?

 3        A.    No.

 4        Q.    Because of the rain?

 5        A.    No.

 6        Q.    Okay.  So between when you went in,

 7   when the play was called because of rain and

 8   when you went to move the cart, you hadn't

 9   changed your clothes?

10        A.    No.

11        Q.    And as far as you know, Mrs. Pine

12   hadn't changed her clothes either?

13        A.    Correct.

14        Q.    And your intention or at least the

15   tournament group's intention was to resume play

16   if the weather improved?

17        A.    Yes.

18                MR. REILLY:  I object to the

19   form.

20        Q.    BY MS. BENSON:  I am showing you what

21   we have had marked as Exhibit 2, and I'll ask

22   you if you recognize it?

23        A.    Yes, I do.

24        Q.    And what are these?
```

112

1        A.    These are the questions asked of me.

2        Q.    The answers to interrogatories?

3        A.    Correct.

4        Q.    And can you turn to Page 12, please?

5        A.    (Witness complies.)

6        Q.    Is that your signature?

7        A.    It is.

8        Q.    Okay.  I have a couple more questions.

9   You can set that aside.  Thank you.  About the

10  golf cart, what was the floor of the cart made

11  of?

12       A.    I think, I'm not sure what the floor

13  is made of.  There seems to be maybe like a

14  rubber or a tile.  I don't know what, you know,

15  it was for the flooring.

16       Q.    Okay.  Is there any kind of non-skid

17  or other traction device on the floor of the

18  golf cart?

19       A.    I don't believe so.

20       Q.    Do you know what I mean when I say

21  non-skid or traction?

22       A.    Yes.

23       Q.    When you say it could be tile, could

24  you elaborate on that?

113

1          A.     It's dark in color and it's not

2     carpeting.  It's not -- actually, it's not

3     ceramic tile but sort of like just a covering on

4     the floor.

5          Q.     Is that covering textured?

6          A.     I don't know.

7          Q.     Okay.  And looking at Exhibit 1 is the

8     cart, that was the cart that you were driving.

9     Is the cart portrayed in Exhibit 1 a similar

10    height?  In other words, from the ground to

11    where you would step into the cart?

12                    MR. REILLY:  I object to the

13    form.

14                    THE WITNESS:  I don't know.

15         Q.     BY MS. BENSON:  Did the cart that you

16    were driving have anything between the floor and

17    where you stepped to get out like an

18    intermediate step?

19         A.     I don't believe so, no.

20         Q.     Did the cart that you were driving

21    have anything on the sides where the armrests

22    are, other than what is shown in this

23    photograph?

24         A.     I don't believe so.

114

1     Q.    Is there anything different about the

2    front of the cart, as far as the shape and the

3    bumper, from the cart you were driving that day?

4     A.    They look similar.  I don't know if

5    there are any discrepancies in them.

6     Q.    Is there anything about the cart that

7    you were driving that you remember that's

8    different from the one shown in Exhibit 1?

9     A.    The only thing that could be

10   different, and I'm not sure, is the seat backs

11   might be one instead of two separate.

12    Q.    Okay.  How about the height of the

13   seat back?

14    A.    I don't know.

15    Q.    Did your cart have anything hanging

16   from the roof to the side of the cart?

17    A.    No.

18    Q.    Have you seen carts that have these

19   sort of plastic shields that go from the roof

20   down to the side of the cart?

21    A.    Would that be something you roll up

22   and roll down in case it's raining?  I have seen

23   those.

24    Q.    But the cart you drove that day at the

GOUDREAU & GROSSI COURT REPORTING (508) 823-4659

115

1    Hawthorne Country Club didn't have that

2    mechanism?

3        A.    No.

4        Q.    Did the cart you drove that day have

5    any way to protect the clubs as they were

6    mounted aft?

7        A.    No.

8        Q.    Behind the cart?

9        A.    No.

10       Q.    Did any of the carts at Hawthorne

11    Country Club have a way to protect the clubs

12    when they were mounted aft?

13       A.    I don't believe so.

14       Q.    Are you familiar with a dropcloth or a

15    cloth that you, the golfers carry that you put

16    over your clubs?

17       A.    Am I familiar with that?

18       Q.    Yes.

19       A.    Yes.

20       Q.    What is that called you protect your

21    clubs with?

22       A.    I think it would just be the bag

23    cover.

24       Q.    Bag cover?

116

1       A.      Yeah.

2       Q.      Did you have one with you that day?

3       A.      I don't know if it was with me.

4       Q.      Do you have one now?

5       A.      Yes, now.

6       Q.      Do you know if Mrs. Pine had one with

7   her that day?

8       A.      No, I don't know.

9       Q.      You don't recall?

10      A.      I just don't know.

11      Q.      Could you describe the bag cover that

12  you have for me?

13      A.      The one I have matches the color of

14  the bag and is of material like the bag and it

15  snaps on, covering your clubs.

16      Q.      Okay.  Would it prevent the clubs from

17  getting wet?

18      A.      It would help to protect them from

19  getting wet.

20      Q.      Okay.  And the cart that you drove

21  that day at the Hawthorne Country Club, you

22  testified that had a platform or a place to put

23  the clubs all the way aft?

24      A.      Yes.

165

1       Q.     And when you parked the first time,

2  this was not covered with a canopy; is that

3  correct?

4       A.     Correct.

5       Q.     Is it fair to say prior to the

6  incident you had a social relationship with

7  Mrs. Pine?

8       A.     Yes.

9       Q.     How is your relationship with

10  Mrs. Pine today?

11       A.     We don't have a relationship at all.

12       Q.     And when did you stop having a

13  relationship with Mrs. Pine?

14       A.     When I was served papers by

15  Ms. Benson.

16       Q.     So had you discussed the lawsuit with

17  Mrs. Pine since you received the papers?

18       A.     No.

19       Q.     What about prior to being served with

20  papers, had you discussed the possibility of

21  Mrs. Pine filing a lawsuit with regard to the

22  incident?

23       A.     Mrs. Pine brought that subject up to

24  me when we went to lunch one day.

166

1    Q.   How long after the incident was that?

2    A.   I believe it was middle to end of

3  August.

4    Q.   In 2001?

5    A.   2001, yes.

6    Q.   And do you recall what she told you at

7  that time?

8    A.   We were having lunch and she said

9  she had to ask me something and I asked her

10  what, and she said how would I feel if she

11  brought a claim against my homeowners insurance

12  for the incident.

13    Q.   And do you recall what you told her in

14  response?

15    A.   I didn't really give her a response.

16  Well, I did say why would you do that?  She

17  claimed it was because there were a lot of

18  medical bills and she was afraid that that

19  wouldn't all be paid for, and I said but you

20  have medical insurance to cover the medical

21  expenses, and she says, well, Bobby, if he

22  didn't keep his job at Stop & Shop he could

23  possibly lose his health care coverage, and she

24  said that's what insurances are for and she

GOUDREAU & GROSSI COURT REPORTING (508) 823-4659

167

1     didn't mind if I sued her insurance company as a

2     countersuit and when it was over, I really

3     hadn't given her a response saying one way or

4     another because I was pretty much dumbfounded.

5          Q.    Was that the last time you spoke with

6     her prior to receiving the service of the

7     lawsuit?

8          A.    I think it was the last time because

9     it was shortly after that lunch that I received

10    a letter in the mail that Ms. Benson was

11    representing them.

12         Q.    At the time that you had the

13    conversation at lunch, did she give you any

14    reasons why she thought her husband might lose

15    his job at Stop & Shop?

16         A.    No, no.

17         Q.    Is your husband still friendly with

18    Mr. Pine, do you know?

19         A.    No.

20         Q.    Did his relationship with Mr. Pine end

21    at the same time that your relationship ended

22    with Mrs. Pine?

23         A.    Pretty much so, they still worked

24    together, but since then Mr. Pine has taken

168

1    transfer to another Stop & Shop store so they're

2    not in contact any more at all.

3        Q.    And they no longer play golf

4    together?

5        A.    No.

6        Q.    Did you ever apologize to Mrs. Pine

7    about what happened?

8                MR. REILLY:  I object to the

9    form and otherwise.

10                THE WITNESS:  I didn't apologize

11    to her.  I said I was sorry the whole thing

12    happened but I didn't apologize in the fact

13    of --

14        Q.    BY MS. SPELLMAN:  I'm not insinuating

15    you made an apology because you were at fault.

16    Did you ever have a conversation where you

17    expressed your regret that the incident

18    occurred?

19        A.    Absolutely, yes.

20        Q.    And do you recall what she said in

21    response to that?

22        A.    Well, she said her and Mr. Pine stated

23    that this was not my fault, that not to be

24    concerned about it, that it was just an

GOUDREAU & GROSSI COURT REPORTING (508) 823-4659

169

```
 1    accident.  I was just upset about the whole

 2    situation happening.

 3        Q.    And that was obviously prior to the

 4    conversation you had with her where she said

 5    that she planned on filing a lawsuit against

 6    your homeowner insurance?

 7        A.    Yes.

 8                MS. SPELLMAN:  I have no further

 9    questions.

10                MR. REILLY:  I have no

11    questions.

12          (The deposition concluded at 1:06 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24
```

GOUDREAU & GROSSI COURT REPORTING (508) 823-4659

170

```
1                    C E R T I F I C A T E

2

3             I, JEAN ARRUDA, hereby certify the

4    foregoing is a true and accurate transcript and has

5    been read and signed under the pains and penalties

6    of perjury this 22nd day of

7    August, 2005.

8

9

10

11                    /s/ Jean Arruda

12                    JEAN ARRUDA

13

14

15

16

17

18

19

20

21

22

23

24
```

1    history of how an accident took place in

2    accordance with our discussion.  I understand

3    what you are looking for.

4              MS. SPELLMAN:  Explain to me

5    what's been redacted.

6              MR. REILLY:  Treatment from the

7    hospital itself, what they prescribed, what the

8    diagnosis was, health care information would be

9    privileged.

10             MS. SPELLMAN:  Okay.

11             MR. REILLY:  What we have not

12   redacted are statements attributed to summaries

13   relating to the interrogatories and just a

14   general description of what the injuries might

15   have been, which we already covered in the

16   deposition.

17             MS. SPELLMAN:  Okay.

18             (Exhibit 3 was marked for

19   identification.)

20       Q.   BY MS. BENSON:  Okay.  I'll come back

21   to this in a minute.  But Exhibit A attached to

22   the deposition notice also requests any and all

23   photographs taken at the Hawthorne County Club.

24   Are any photographs being produced today?

GOUDREAU & GROSSI COURT REPORTING (508) 823-4659

131

```
 1                    MR. REILLY:  No, the only

 2    photograph that existed was the one that your

 3    client produced and my client tossed her copy

 4    long before this case, discarded her copy and

 5    destroyed it before this case began.

 6                    MS. BENSON:  So nothing produced

 7    there.

 8                    MR. REILLY:  And of course, you

 9    will have to ask her.

10                    MS. BENSON:  I will.

11                    MR. REILLY:  To summarize what

12    we're talking about.

13                    MS. BENSON:  I'll inquire.

14    Thank you.  And Exhibit A, any and all

15    documents, papers or other records regarding

16    member guest tournaments held at Hawthorne

17    Country Club.  Are there records being produced?

18                    MR. REILLY:  We take that to be

19    limited to what may have been provided that day

20    and she has no -- technically that request could

21    encompass every single paper in this case and

22    I'm not about to list a privileged log of papers

23    and so forth.  And I'll repeat the fact that we

24    have all the pleadings in this case and my
```

GOUDREAU & GROSSI COURT REPORTING (508) 823-4659

1   reports to my client's insurance company and

2   things like that.  We're not going to make a

3   privileged log of that but there are no

4   documents of that day.

5              MS. BENSON:  I think that's a

6   fair request but your representation is

7   basically what we have here, the two-page

8   Exhibit Number 3, is what has been produced

9   today to the request, period.  There are no

10   other records?

11             MR. REILLY:  We have not had

12   time to seek the ambulance records.

13             MS. BENSON:  Okay.

14             MR. REILLY:  I just got an

15   authorization today.

16     Q.   BY MS. BENSON:  All right.  Thank you.

17   So Ms. Arruda, I call your attention to that

18   member guest tournament at Hawthorne Country

19   Club, again, were photographs taken that day?

20     A.   Yes.

21     Q.   Who took the photographs?

22     A.   I don't know.

23     Q.   How many photographs were taken of you

24   and your guest?

133

1       A.      There was one photograph taken, two

2   copies made.

3       Q.      Okay.  And what became of your copy?

4       A.      I threw it away.

5       Q.      Do you know when you threw it away?

6       A.      After I was served papers by you.

7       Q.      And do you know what became of the

8   other copy?

9       A.      I gave it to Beverly.

10      Q.      Beverly Pine?

11      A.      Yes.

12      Q.      When did you give it to Mrs. Pine?

13      A.      I believe it was on my first visit to

14  her home.

15      Q.      And what did that photograph show?

16      A.      It showed her and I together that day

17  of the tournament.

18      Q.      When was it taken?

19      A.      It was taken on the day of the

20  tournament.

21      Q.      Was it taken in the morning?

22      A.      Yes.

23      Q.      Had you started playing yet?

24      A.      Yes.

134

1      Q.    Do you remember if it was -- do you

2    recall where it was taken at the facility?

3      A.    I haven't viewed it in a while but I

4    believe it was on the 8th tee off, where you tee

5    off on the 8th hole.

6      Q.    So if it was there, if your memory is

7    correct, how many holes would you have played at

8    the time the photograph was taken?

9      A.    Two.

10     Q.    Just two?

11     A.    Yes.

12     Q.    Were any photographs taken of the two

13   other players to make up your foursome?

14     A.    Yes.

15     Q.    How many photographs of the two other

16   players?

17     A.    I would say one photograph and two

18   copies made.

19     Q.    Okay.  Were there any photographs made

20   of all four of you?

21     A.    I don't recall that, no.

22     Q.    How about photographs showing the

23   decorated cart?

24     A.    I don't know.

GOUDREAU & GROSSI COURT REPORTING (508) 823-4659

165

```
 1        Q.    And when you parked the first time,
 2    this was not covered with a canopy; is that
 3    correct?
 4        A.    Correct.
 5        Q.    Is it fair to say prior to the
 6    incident you had a social relationship with
 7    Mrs. Pine?
 8        A.    Yes.
 9        Q.    How is your relationship with
10    Mrs. Pine today?
11        A.    We don't have a relationship at all.
12        Q.    And when did you stop having a
13    relationship with Mrs. Pine?
14        A.    When I was served papers by
15    Ms. Benson.
16        Q.    So had you discussed the lawsuit with
17    Mrs. Pine since you received the papers?
18        A.    No.
19        Q.    What about prior to being served with
20    papers, had you discussed the possibility of
21    Mrs. Pine filing a lawsuit with regard to the
22    incident?
23        A.    Mrs. Pine brought that subject up to
24    me when we went to lunch one day.
```

166

1    Q.    How long after the incident was that?

2    A.    I believe it was middle to end of

3    August.

4    Q.    In 2001?

5    A.    2001, yes.

6    Q.    And do you recall what she told you at

7    that time?

8    A.    We were having lunch and she said

9    she had to ask me something and I asked her

10   what, and she said how would I feel if she

11   brought a claim against my homeowners insurance

12   for the incident.

13   Q.    And do you recall what you told her in

14   response?

15   A.    I didn't really give her a response.

16   Well, I did say why would you do that?  She

17   claimed it was because there were a lot of

18   medical bills and she was afraid that that

19   wouldn't all be paid for, and I said but you

20   have medical insurance to cover the medical

21   expenses, and she says, well, Bobby, if he

22   didn't keep his job at Stop & Shop he could

23   possibly lose his health care coverage, and she

24   said that's what insurances are for and she

167

1    didn't mind if I sued her insurance company as a

2    countersuit and when it was over, I really

3    hadn't given her a response saying one way or

4    another because I was pretty much dumbfounded.

5        Q.    Was that the last time you spoke with

6    her prior to receiving the service of the

7    lawsuit?

8        A.    I think it was the last time because

9    it was shortly after that lunch that I received

10   a letter in the mail that Ms. Benson was

11   representing them.

12       Q.    At the time that you had the

13   conversation at lunch, did she give you any

14   reasons why she thought her husband might lose

15   his job at Stop & Shop?

16       A.    No, no.

17       Q.    Is your husband still friendly with

18   Mr. Pine, do you know?

19       A.    No.

20       Q.    Did his relationship with Mr. Pine end

21   at the same time that your relationship ended

22   with Mrs. Pine?

23       A.    Pretty much so, they still worked

24   together, but since then Mr. Pine has taken

168

1    transfer to another Stop & Shop store so they're

2    not in contact any more at all.

3        Q.    And they no longer play golf

4    together?

5        A.    No.

6        Q.    Did you ever apologize to Mrs. Pine

7    about what happened?

8                MR. REILLY:  I object to the

9    form and otherwise.

10               THE WITNESS:  I didn't apologize

11   to her.  I said I was sorry the whole thing

12   happened but I didn't apologize in the fact

13   of --

14       Q.    BY MS. SPELLMAN:  I'm not insinuating

15   you made an apology because you were at fault.

16   Did you ever have a conversation where you

17   expressed your regret that the incident

18   occurred?

19       A.    Absolutely, yes.

20       Q.    And do you recall what she said in

21   response to that?

22       A.    Well, she said her and Mr. Pine stated

23   that this was not my fault, that not to be

24   concerned about it, that it was just an

169

1    accident.  I was just upset about the whole

2    situation happening.

3        Q.    And that was obviously prior to the

4    conversation you had with her where she said

5    that she planned on filing a lawsuit against

6    your homeowner insurance?

7        A.    Yes.

8                    MS. SPELLMAN:  I have no further

9    questions.

10                    MR. REILLY:  I have no

11    questions.

12            (The deposition concluded at 1:06 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

170

```
 1                    C E R T I F I C A T E

 2

 3              I, JEAN ARRUDA, hereby certify the

 4     foregoing is a true and accurate transcript and has

 5     been read and signed under the pains and penalties

 6     of perjury this        day of

 7                    , 2005.

 8

 9

10

11

12                    JEAN ARRUDA

13

14

15

16

17

18

19

20

21

22

23

24
```